**To Be Published in Federal Supplement 2d**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 2007-68 (WOB)**

ALINE SUMME                                                                               PLAINTIFF

VS.                                      **OPINION AND ORDER**

KENTON COUNTY CLERK'S OFFICE,[1]
ET AL.                                                                                DEFENDANTS

**BERTELSMAN, District Judge:**

Plaintiff alleges that defendant Eldridge, the Kenton County Clerk, in his individual and official capacities, wrongfully terminated her from her position with the Kenton County Clerk's Office for political patronage reasons. She also asserts claims against the County stemming from its alleged wrongful dissemination of her "medical" records. The case is now before the court on defendant Eldridge's motion for summary judgment (Doc. 26), and defendant Kenton County's motion for summary judgment (Doc. 54). The parties have responded to the respective motions.

**FACTS**

Summe was employed by the Fiscal Court[2] as the director of the Kenton County Animal Shelter from 1985 until 2004. In August 2003, the Kenton County Fiscal Court referred all the

---

[1]This defendant happens to be the named leading defendant in this matter, but the court notes it is not a proper defendant. The matter against Eldridge in his official capacity is an action against the County. See footnote 6.

[2] The Kenton County Fiscal Court is the County's legislative and governing body, analogous to the county commissioner in most other states.

animal shelter employees, including Summe, to St. Elizabeth Hospital's Employee Assistance Program (EAP) in an effort to address office conflict and its low employee morale.  As part of the intervention, EAP director Tina Rich met individually with the animal shelter employees and issued a report, dated August 13, 2003, to Scott Kimmich, the Kenton County Deputy Judge Executive.

In the report, Rich summarized the issues raised in the employee interviews and Summe's response.  Rich made recommendations to help remedy the personnel problems at the shelter.  Ms. Rich stated, "[M]y opinion is that there is a tremendous amount of damage, which has been done.  I question if the damage is too great to repair and if the parties can put aside their differences for the common good.  Management skills are weak at best and need immediate assistance to improve.  The solution must start with the management and lead by example."  Summe denied that the report accurately portrayed the working environment at the shelter.

One of Rich's suggestions was for Summe to work with Rich in developing her management skills.  Summe believed Rich was biased against her and, after a few sessions, refused to continue with the meetings.  As a result, Summe was terminated.  Summe appealed her termination.  The parties entered into a settlement agreement, which permitted Summe to resign.

On December 16, 2003, the Kenton County Fiscal Court received an open records request from Randy Skaggs, who was associated with a no-kill sanctuary for dogs and cats.  Mr. Skaggs requested all documents related to Summe's removal as the director of the animal shelter.  The records custodian denied the request on the basis that the records were personal in nature and would result in an invasion of Summe's privacy.  Mr. Skaggs appealed this denial to the

2

Kentucky Attorney General who found that the Fiscal Court had violated the Open Records Act in denying Mr. Skaggs' request. Ky. Op. Atty. Gen. 04-ORD-031 (Feb. 13, 2004). Summe asserts that, despite the Attorney General's opinion, the records were never sent to Mr. Skaggs. It is not clear, however, whether Mr. Skaggs abandoned his request or whether the County appealed the Attorney General's decision.

In March 2004, Summe was hired by Bill Aylor, then the Kenton County Clerk, as a deputy clerk. On May 11, 2006, Aylor promoted Summe to chief deputy county clerk, and she remained in that position until December 29, 2006. In early 2006, Aylor announced he was not running for re-election. Summe decided to run for county clerk as the Democratic candidate against defendant Eldridge, the Republican candidate. The plaintiffs in a companion case, *Davis v. Kenton County*, 07-cv-67, Summe's fellow employees, supported Summe in her campaign.

On October 5, 2006, a Community Press article quoted Eldridge as questioning Summe's experience and raising the issue of Summe's "unexplained departure from the animal shelter in 2003" as being a "big question mark."

On October 24, 2006, a few weeks before the election, Kenton County Records Custodian, Joe Shriver, received an open records request from David Sizemore,[3] requesting Summe's personnel file and all documents related to Summe's departure as the director of the animal shelter. Mr. Shriver released thirteen pages of documents in response to this request. On October 27, 2006, Mr. Sizemore served another open records request, seeking documents related to Summe from St. Elizabeth Hospital's Employee Assistance Program. Shriver released the

---

[3]Summe asserts that Mr. Sizemore is a dog breeder with whom she had conflicts while working at the animal shelter. Mr. Sizemore contributed to Eldridge's campaign.

August 13, 2003 letter from Ms. Rich to Deputy Judge Executive Kimmich.  Eldridge claimed he

had not seen the document until it appeared, unsolicited, at his house.  A copy of the document

was also left in one of  Summe's coworker/campaign supporter's mailbox with a note stating

"something to read when you are out of a job January 1, 2007."

In November 2006, Eldridge won the election.  On December 15, 2006, Eldridge sent a

letter to Summe, and the plaintiffs in the companion case,[4] stating that he had decided not to

continue their employment in 2007.  (Doc. 42-4).  Eldridge never supervised any of the

discharged employees and did not interview them prior to their dismissal.  Summe claims that

Eldridge replaced them with campaign supporters and/or contributors and that he retained and/or

promoted deputy clerks who supported and/or contributed to his campaign.

## ANALYSIS

### A.  The summary judgment standard.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party

seeking summary judgment bears the initial burden of demonstrating the absence of a genuine

issue of material fact as to an essential element of the nonmoving party's claim.  *Street v. J.C.*

*Bradford & Co.,* 886 F.2d 1472, 1479 & n. 12 (6th Cir. 1989).

Upon the movant's showing of the absence of a genuine issue of material fact, the

nonmovant must "set out specific facts showing a genuine issue for trial" in order to defeat

summary judgment.  Fed. R. Civ. P. 56 (e)(2).  Although the court must review the evidence in

---

[4]A letter was also sent to another coworker, but she was ultimately rehired.

the light most favorable to the plaintiff, as the nonmoving party, the plaintiff is required to "do

more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 586 (1986). "The mere existence

of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 252 (1986).

**B. Eldridge is entitled to summary judgment on the federal claim.**

> **1. Claim of patronage dismissal against Eldridge, in individual and official
> capacities**.

Summe has asserted a § 1983 claim against Eldridge, in his individual and official

capacities, alleging he refused to rehire her for political reasons.

Patronage dismissals, which are dismissals for failure to support a particular party or

candidate, are unconstitutional violations of the guarantees of the First Amendment, with certain

exceptions. Politically-motivated firings violate the First Amendment by restraining the freedom

of the employee to hold whatever political beliefs he or she desires and to associate with others to

advance those beliefs. *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347

(1976); *Faughender v. City of North Olmsted, Ohio*, 927 F.2d 909, 912 (6th Cir. 1991). *See also*

*Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990) (*Elrod* and *Branti* not limited to

dismissals).

However, party affiliation may be an acceptable government employment requirement for

certain types of positions that are often referred to as "policy-making" or "confidential." *Branti*,

445 U.S. at 513-16; *Lane v. City of Lafollette, Tenn.*, 490 F.3d 410, 419 (6th Cir. 2007). These

labels are not determinative. Rather, it is the inherent duties and nature of the particular position that must be examined. *Lane,* 490 F.3d at 419. The Sixth Circuit has stated:

> [T]he test is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." In answering this question, the Court looks not to the position as it was performed by the terminated employee, but instead to the inherent duties of the position, and to the duties that the new holder of that position is expected to perform. . . .
>
> The first step in analyzing a claim of patronage dismissal requires asking whether the party asserting that he was wrongfully terminated has produced sufficient evidence for a jury to find that he was discharged because of his political beliefs or affiliations. If the terminated party makes this showing, then the *burden shifts to the employer to demonstrate that the terminated party's job was one for which political affiliation was an appropriate requirement.*

*Id.* (internal citations omitted) (emphasis added).

The Sixth Circuit has also delineated four categories of government employment that qualify for political patronage exceptions: (1) those that are specifically named in a relevant statute or that are charged with the discretionary authority to carry out the law or other policy of political concern; (2) a position to which discretionary decision-making of the first category has been delegated; (3) confidential advisors to category one or two; and (4) positions filled to balance out party representation. *Caudill v. Hollan,* 431 F.3d 900, 908 (6th Cir. 2005) (*citing McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996)).

Further, some positions are inherently confidential, or by their nature are positions for which political affiliation is relevant. *See Branti*, 445 U.S. at 518; *Faughender*, 927 F.2d at 912-13; *Williams v. City of River Rouge*, 909 F.2d 151, 154 (6th Cir. 1990). In *Faughender* and *Williams*, the court did not decide that the positions at issue were not protected because they were policy-making positions, but rather because they were inherently confidential positions.

6

In the view of this court, the same is true of Ms. Summe's position as chief deputy to the county clerk, an extremely important office.  Such an official must have one or more subordinates at the top level whom he or she can trust, just as the captain of a ship must have a good first mate or executive officer upon whose loyalty and discretion he can rely.  The clerk's staff and the public will perceive the chief deputy, by virtue of her position, to be the voice of the clerk, and she will be in a position to thwart his policies and hurt him politically and managerially if she is not loyal to him.  Thus, in the opinion of this court, whatever the day-to-day duties of the chief deputy may be, her position is inherently one for which political affiliation is appropriate.

Further, even if Summe could make out a prima facie case of patronage dismissal, Summe's position as chief deputy county clerk falls within the *Branti* exception to the First Amendment right to be free from patronage dismissals because her position is by its very nature a position for which political affiliation is relevant.  *See Branti*, 445 U.S. at 518; *Williams*, 909 F.2d at 154.

To determine whether party affiliation is an appropriate requirement for the performance of a public office, "the court must examine two things:  (1) 'the inherent duties of the position in question' and (2) the 'duties that the new holder of that position will perform' as envisioned by the newly elected official (the defendant)."  *Hoard v. Sizemore*, 198 F.3d 205, 212 (6th Cir. 1999) (citing *Blair v. Meade*, 76 F.3d 97, 100 (6th Cir. 1996) (citing *Faughender,* 927 F.2d at 913)).

Summe was the chief deputy county clerk.  As chief deputy county clerk, Summe reported directly to the county clerk.  She testified that, after she became the chief deputy county

clerk, she instituted a cross-training program, she altered employee lunch hours, she continued to supervise the Independence office, and she assigned employees to different stations.

Former Kenton County Clerk William Aylor's affidavit provides further support that Summe's position was one in which discretionary authority of the county clerk had been delegated. Specifically, Aylor stated that "it was [his] intention in making [the] appointment, and in fact Ms. Summe did, take over the responsibility for running various aspects of the Clerk's Office on a day to day basis subject only to my final authority." (Doc. 26-4). He further stated that "a portion of my discretionary authority as Kenton County Clerk was delegated to Ms. Summe in her position as Chief Deputy Clerk." (Doc. 26-4).

Summe filed a subsequent affidavit of Aylor that states that he had final authority and approval over all Summe's recommendations, and she had no ability to effect any personnel changes without his approval. (Doc. 43). Summe thus argues that her position was simply a mid-level managerial position similar to that of the personal property tax administrator in *McCloud v. Testa*, 227 F.3d 424, 429 (6th Cir. 2000), which the Sixth Circuit held was not sufficient to be subjected to a patronage dismissal. The evidence, however, rebuts this argument.

When Aylor first promoted Summe, he sent a memo to all personnel notifying them of her appointment to chief deputy county clerk and stating, "[i]n this position she will be handling all personnel issues in both the Independence and Covington Office." (Doc. 49-2). Summe testified that after her appointment she initiated a cross-training program for the Clerk's Office to effect a more efficient manner of providing customer service. She moved people to different stations, even moving at least one employee to a different location. This evidence establishes that the county clerk had delegated a substantial part of his discretionary authority to Summe and,

8

therefore, the position falls within the definition of a category two position under *McCloud,* 97

F.3d at 1557.

Summe's role in the Clerk's Office is thereby distinguishable from that of a mid-level

managerial position since she was essentially second in command.  Indeed, the chief deputy

position is at least as "policy-making" as the road foreman or assistant road foreman positions in

*Hoard*, 198 F.3d at 214-15.[5]  Nor were her duties merely "clerical" as contemplated by the Sixth

Circuit in *Caudill*.  *See Caudill*, 431 F.3d at 910.

For the above reasons, the chief deputy county clerk position is "by its nature [one] for

which political affiliation is relevant."  *See Williams*, 909 F.2d at 154.  Therefore, the chief

deputy county clerk would be subject to patronage dismissal, and Eldridge, in both his individual

and official[6] capacities, is entitled to summary judgment on this claim.

---

[5]Furthermore, the fact Summe was Eldridge's opponent in a contentious election is not
without some import.  The Sixth Circuit has held that "no reading of the First Amendment
required [county clerk] to retain [deputy county clerk] after [deputy county clerk] announced her
intention to run against [county clerk] for [county clerk's office]. . . .  The First Amendment does
not require that an official in [the county clerk's] situation nourish the viper in the nest." *Carver
v. Dennis*, 104 F.3d 847, 853 (6th Cir. 1997).  *See also Greenwell v. Parsley*, 541 F.3d 401, 404
(6th Cir. 2008), *petition for cert. filed*, 77 U.S.L.W. 3618 (April 27, 2009) (sheriff's firing of
deputy sheriff after learning deputy planned to run against him in election did not violate
deputy's First Amendment rights); *Myers v. Dean*, 216 F. App'x 552, 554 (6th Cir. 2007) (county
clerk's firing of deputy clerk after she ran against him in election did not violate First
Amendment).  *See e.g. Murphy v. Cockrell*, 505 F.3d 446, 450 n. 1 (6th Cir. 2007) (noting in
dicta that Sixth Circuit recently determined where employee fired because of rival candidacy,
First Amendment not violated).  Although *Carver*, *Greenwell* and *Myers* all involved the
employee running against his/her current boss for his/her boss's job, the same theory would apply
to a non-incumbent.  Specifically, Eldridge had an interest in preserving a viable working
environment in the clerk's office, which likely would have been threatened by retaining Summe
after she unsuccessfully ran against him in the election.  Also, she could have used the position to
undermine his re-election campaign, should he decide to run again.

[6]A suit against an official in his official capacity is not a suit against the official but a suit
against the official's office.  *See Mann v. Helmig*, 289 F. App'x 845, 848 (6th Cir. 2008)

**2. Eldridge entitled to qualified immunity on Summe's § 1983 claim**.

Even if the court were to find that Summe's dismissal was not subject to patronage

dismissal, Eldridge would be entitled to qualified immunity in his individual capacity.  Qualified

immunity provides that "government officials performing discretionary functions generally are

shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Sixth Circuit has held that the law in this Circuit with respect to patronage dismissals

of clerical positions, such as county deputy clerks, is "clearly established with the requisite

specificity to satisfy the Supreme Court's requirement that the law 'clearly establish[] in [a] more

particularized sense' that the act was unconstitutional."  *Caudill v. Hollan*, 431 F.3d 900, 913

(6th Cir. 2005).  *Caudill* applied to deputy clerk positions that are basically clerical.  *Id*.  The

─────────────────────

(quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).  Here, a suit against
Eldridge in his official capacity is a suit against Kenton County.  "Pursuant to a § 1983 suit, 'A
municipal liability claim ... must be examined by applying a two-pronged inquiry:  (1) Whether
the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the
[municipality] is responsible for that violation.'  *Doe v. Claiborne County,* 103 F.3d 495, 505-06
(6th Cir. 1996).  In satisfying the second prong of this inquiry, 'A plaintiff who sues a
municipality for a constitutional violation under § 1983 must prove that the municipality's policy
or custom caused the alleged injury.'  *Ellis v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th
Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L.
Ed.2d 611 (1978))."  *Mann,* 289 F. App'x at 848.  It is undisputed that, although the fiscal court
approved the budget, Eldridge had the sole authority for hiring and firing decisions in the clerk's
office and, therefore, his employment decisions constitutes the policy of the County.  *See
Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *Lentz v. City of Cleveland*, No. 07-
4385, 2009 WL 1563433, *4 (6th Cir. June 4, 2009) (city safety director's decision constituted
policy).  Here, the court having found that no deprivation of a constitutional right occurred,
Summe's official capacity claim fails for the same reasons, explained fully above, as her
individual claim.

Sixth Circuit did not extend its holding to positions such as chief deputy county clerk. *See Id.* at

914.

A Fourth Circuit case is directly on point. *Conner v. McGraw*, Nos. 94-1313, 94-1513,

1996 WL 741132 (4th Cir. Dec. 30, 1996). In *Conner*, the plaintiff was the chief deputy clerk for

the Roanoke County Circuit Court Clerk's Office. When the current circuit clerk ran for re-

election, the plaintiff did not help her campaign. The defendant McGraw won the election and

did not reappoint the plaintiff to her position as chief deputy clerk. At a bench trial, the district

court found that the defendant illegally terminated the plaintiff because she supported his

opponent and he wanted to reward one of his supporters with the job. The Fourth Circuit,

however, reversed, finding that the defendant was entitled to qualified immunity:

> In light of the existing precedent and the fact that [the plaintiff] was the number two
> person under [the defendant], who was an elected official, we conclude that [the
> defendant] held the objectively reasonable belief that [the plaintiff's] position was subject
> to political patronage dismissal since she too would be called on to give effect to the
> policies of his office. While the number two position in the clerk's office is also
> substantially an administrative position, it nevertheless remains the backup policy
> position for the clerk.
>
> Without the need, however, of resolving the question of whether the Chief Deputy Clerk
> in Roanoke County is in fact a policy-making person, it cannot be reasonably disputed
> that the law on this subject was not well established. As the Supreme Court has stated,
> the unlawfulness must be apparent[.]

*Conner,* 1996 WL 741132 at *5.

Although the Sixth Circuit held in *Caudill* that it is not necessary for the court to require a

position-specific finding by the court before the law is deemed clearly established, the court finds

that the law is not clearly established as to dismissals of number two positions such as the chief

deputy county clerk.

Therefore, the court finds that, even if the position of chief deputy county clerk was not subject to patronage dismissal, Eldridge is entitled to qualified immunity on Summe's § 1983 claim.

**C. The County is entitled to summary judgment on Summe's additional federal claims.**

      **1. The County is entitled to summary judgment on § 1983 claims for alleged violation of Summe's right to privacy.**

In order to prevail on her § 1983 claim against the County, Summe must prove that she was (1) deprived of a right protected by the Constitution or laws of the United States and (2) that the defendant was acting under the color of state law. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008), *cert. denied,* 129 S. Ct. 905 (Jan. 12, 2009). In addition, Summe must prove that the deprivation occurred as a result of a policy or custom attributable to the County. *Monell v. Dep't. of Soc. Servs. of New York*, 436 U.S. 658, 694-95 (1978).

Summe alleges that the County deprived her of her constitutional right to privacy by releasing her medical records,[7] in response to an open records request, which were then used against her by Eldridge's campaign. (Complaint, Case No: 07-68, Doc. 1). The County denies the record is a medical record.

---

[7]The record at issue is the letter to Deputy Judge Executive Kimmich from EAP Director Rich summarizing her findings and recommendations to improve employee morale at the Kenton County Animal Shelter. Summe argues that the record is a medical record because it was written by a person that she believed, at the time she spoke to her, was a therapist, and the letter is written on St. Elizabeth Hospital letterhead. The county argues that the letter is not a medical record as there is no discussion of Summe's mental or physical health. The court finds that there is no evidence that this record constitutes a medical record. Instead, the record is more akin to a performance evaluation. It provides comments made by other employees of the animal shelter regarding Summe's conduct as the director of the facility and Summe's response to efforts to provide her with management skills training. Nevertheless, even if the record is a medical record, it does not alter the constitutional analysis.

Regardless of the nature of this document, a person does not have a general

constitutional right to privacy for the nondisclosure of private information.  *See Jenkins v. Rock*

*Hill Local School District*, 513 F.3d 580, 591 (6th Cir.), *cert denied*, 128 S. Ct. 2445 (2008)

(school's disclosure of information to Children Services not a violation of plaintiff's

constitutional rights); *Barber v. Overton*, 496 F.3d 449, 455-57 (6th Cir. 2007*)* (Circuit narrowly

construes privacy right to nondisclosure, and release of guards' birth dates and social security

numbers did not rise to constitutional level); *Walker v. Wilson,* 67 F. App'x 854, 856-57 (6th Cir.

2003); *Jarvis v. Wellman*, 52 F.3d 125, 126 (6th Cir. 1995) (disclosure of medical records did not

violate plaintiff's constitutional rights); *Doe v. Wigginton,* 21 F.3d 733, 740 (6th Cir. 1994)

(inmate's constitutional right to privacy not violated by prison officer learning from his medical

records that he was HIV positive); *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (6th Cir. 1981)

(constitutional privacy rights not violated by dissemination of juvenile delinquents' social

histories to various agencies).

Instead, "any constitutional right to privacy must be restricted to those personal rights that

can be deemed fundamental or implicit in the concept of ordered liberty."  *Jenkins*, 513 F.3d at

591 (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir. 1998)).  The Sixth

Circuit has declined to expand constitutional rights of privacy to encompass a general right to

nondisclosure of private information, leaving privacy-rights protection to the states and the

legislative branch.  *DeSanti*, 653 F.2d at 1091.

The Sixth Circuit has recently explained:

Two types of interests have been identified by the Supreme Court as protected by the
right to privacy that is rooted in the substantive due process protections of the Fourteenth
Amendment.  One is the interest in "independence in making certain kinds of important

decisions." *Whalen v. Roe,* 429 U.S. 589, 599-600 & n. 26, 97 S .Ct. 869, 51 L. Ed.2d 64 (1977) (noting that these decisions have been characterized as dealing with "matters relating to procreation, marriage, contraception, family relationships, and child rearing and education" (quoting *Paul v. Davis,* 424 U.S. 693, 713, 96 S. Ct. 1155, 47 L. Ed.2d 405 (1976))).  The other type of privacy interest applicable to individuals is the "interest in avoiding disclosure of personal matters." *Id.* at 599, 603-04, 97 S .Ct. 869 (recognizing that a statute requiring that the state be provided with a copy of certain drug prescriptions implicated the individual's interest in nondisclosure, but upholding the law because the statute contained adequate security measures); *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 465, 97 S. Ct. 2777, 53 L .Ed.2d 867 (1977) (assuming that President Nixon had a legitimate expectation of privacy in his private communications, but upholding a federal law that provided for the review and classification of presidential materials by professional archivists).  [Plaintiff's] claim implicates the latter interest, which this court has described as "an individual's right to control the nature and extent of information released about that individual" and that "has been coined an informational right to privacy." *Bloch v. Ribar,* 156 F.3d 673, 683 (6th Cir. 1998).

This court, in contrast to some of our sister circuits, "has narrowly construed the holdings of *Whalen* and *Nixon* to extend the right to informational privacy only to interests that implicate a fundamental liberty interest." *Id.* at 684.  A plaintiff alleging a violation of her right to informational privacy must therefore demonstrate that "the interest at stake relates to 'those personal rights that can be deemed fundamental or implicit in the concept of ordered liberty.'" *Id.* (quoting *J.P. v. DeSanti,* 653 F.2d 1080, 1090 (6th Cir. 1981)). Only after a fundamental right is identified should the court proceed to the next step of the analysis - the balancing of the government's interest in disseminating the information against the individual's interest in keeping the information private.  *See Kallstrom,* 136 F.3d at 1061 ("This circuit . . . will only balance an individual's interest in nondisclosure . . . against the public's interest in and need for the invasion of privacy where the individual privacy interest is of constitutional dimension.").

Applying these standards, this court has recognized an informational-privacy interest of constitutional dimension in only two instances:  (1) where the release of personal information could lead to bodily harm (Kallstrom ), and (2) where the information released was of a sexual, personal, and humiliating nature (Bloch).  In *Kallstrom,* the plaintiffs were undercover police officers who had been actively involved in a drug-conspiracy investigation of a violent gang and who had subsequently testified at trial against a number of the gang's members.  136 F.3d at 1059.  During the trial, the city - despite having promised to keep the officers' personnel records confidential - released the officers' records to defense counsel.  The records contained, among other personal information, the names and addresses of the officers, their immediate family members, and their personal references.  *Id.*

This court in *Kallstrom* concluded that the officers' privacy interests were of

14

constitutional dimension because they implicated a fundamental interest "in preserving their lives and the lives of . . . their family members, as well as preserving their personal security and bodily integrity." *Id.* at 1062.  That conclusion was supported by a long line of cases, dating back to the nineteenth century, in which courts have held that individuals have a constitutional right to avoid the kind of *physical* invasions or abuse that "strip[ ] the very essence of personhood." *Id.* at 1063 (internal quotation marks omitted).  The *Kallstrom* court's holding therefore rested on the finding that the city's disclosure had created a risk that the officers' personal information might "fall into the hands of persons likely to seek revenge upon the officers" and had created a "very real threat" to the officers' and their family members' bodily integrity and possibly even their lives. *Id.*

In *Bloch,* this court considered whether the constitutional right to informational privacy was triggered by a press conference in which the sheriff released the "highly personal and extremely humiliating details" of the rape to which Bloch had been subjected, some of which were "so embarrassing she had not even told her husband." *Bloch,* 156 F.3d at 676.  The court concluded that Bloch could invoke her Fourteenth Amendment right to privacy because "sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood." *Id.* at 685.

As in *Kallstrom,* this court's holding in *Bloch* was premised on the notion that the disclosure of private sexual information implicated a "fundamental right or one implicit in the concept of ordered liberty" - namely the fundamental right of privacy in one's sexual life. *Id.* at 684, 686.  The clear principle emerging from *Bloch* is that the sheriff's publication of the details of Bloch's rape implicated her right to be free from governmental intrusion into matters touching on sexuality and family life, and that to permit such an intrusion would be to strip away the very essence of her personhood. *See id.* at 685 (citing *Thorne v. City of El Segundo,* 726 F.2d 459, 468 (9th Cir. 1983)), for the proposition that an individual's privacy right in her sexual activities "follow[ed] from the cases holding that such basis matters as contraception, abortion, marriage, and family life are protected by the constitution from unwarranted government intrusion").

*Lambert,* 517 F.3d at 440-41 (italics in original).

Here, Summe has not set forth sufficient facts to establish that the release of the record in question implicated a fundamental right or one implicit in the concept of ordered liberty.  Instead, she attempts to argue that the facts are so oppressive that they shock the conscience.  The release of the record at issue, however, does not rise to such a level.

In fact, as the Sixth Circuit has recognized, "[p]ublic officials may need to have thicker

15

skin than the ordinary citizen when it comes to attacks on their views." *Mattox v. City of Forest Park*, 183 F.3d 515, 522 (6th Cir. 1999). "Running for elected office diminishes an individual's privacy rights." *See Creel v. City of Cleveland, TN*, No. 1:07-cv-61, 2008 WL 2169507 *4 (E.D. Tenn. May 22, 2008) (citing *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 894 n. 9 (D.C. Cir. 1995)).

Here, Summe was running for Kenton County Clerk. It was public knowledge that Summe had previously worked as the director of the Kenton County Animal Shelter and that she was no longer employed at the shelter. The issues raised by the report, whether she was a fair, effective and ethical manager, are issues that one would expect to be raised in the campaign. The release of an employment record reporting on a public employee's management skills does not shock the conscience such that a substantive due process right is created, especially when that employee is a candidate for an important public office.[8] Thus, Summe's privacy concern over the release of the record in question does not take on constitutional dimensions.

Summe also argues that the release of the record in issue violated her procedural due process rights under the Fourteenth Amendment. Summe, however, did not raise this claim in her complaint and, therefore, the issue is not properly before the court.

Accordingly, the court finds that Summe has not met her burden of establishing that the

---

[8]State law affords a candidate for public office only a drastically limited privacy right against the release of private information. Restatement (Second) of Torts § 652D states: "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." The qualifications of a candidate for public office is an area of legitimate concern to the public and, therefore, a candidate loses his or her privacy right to this information. *See* 62A Am. Jur. 2d *Privacy*, §§ 199-200.

release of the record violated a constitutional right to privacy, and the County is entitled to summary judgment on this claim.

## 2. The County is entitled to summary judgment on the First Amendment retaliation claim.

Summe also argues that the County retaliated against her for exercising her constitutional right to run for office by releasing her private records and terminating her.

To prove a retaliation claim, Summe must establish three elements: (1) that she was engaged in a constitutionally protected activity; (2) that the County's adverse action caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to Summe's exercise of her constitutional rights. *See Mattox v. City of Forest Park*, 183 F.3d 515, 520 (6th Cir. 1999) (citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)).

Summe attempts to meet the first element by claiming that she was engaged in the constitutionally protected activity of running for public office. The Sixth Circuit, however, has held that a person's interest in seeking office, by itself, is not entitled to constitutional protection, finding "the [Supreme] Court has never recognized a fundamental right to express one's political views through candidacy." *Carver v. Dennis*, 104 F.3d 847, 850-51 (6th Cir. 1997).

Summe argues that *Carver* was limited by *Murphy v. Cockrell*, 505 F.3d 446 (6th Cir. 2007). In *Murphy*, however, the plaintiff was terminated not because of her candidacy, but because of her speech during the campaign. *Murphy*, 505 F.3d at 450. Summe also cites a Tennessee district court case which granted a temporary injunction against hiring the plaintiff's replacement, finding that *Carver's* holding that the right to run for office is not a fundamental

17

right does not mean that the right has no constitutional protections. *Becton v. Thomas*, 48 F. Supp. 2d 747, 756 (W.D. Tenn. 1999). At least one panel of the Sixth Circuit has discussed *Becton*, noting it was critical of *Carver*, but nonetheless finding *Carver* to still be binding on this Circuit. *See Greenwell v. Parsley*, 541 F.3d 401, 405 (6th Cir. 2008), *petition for cert. filed*, 77 U.S.L.W. 3619 (April 27, 2009).

While panels of the Sixth Circuit have questioned *Carver*'s holding and sought to limit it, the Court has not chosen to revisit the issue, and *Carver* remains the law of the Circuit. *See Greenwell*, 541 F.3d at 404 (plaintiff discharged because of rival candidacy, thus no First Amendment violation occurred); *Myers v. Dean*, 216 F. App'x 552, 554 (6th Cir. 2007) (finding *Carver* binding, no First Amendment violation for firing employee who announces running for office against boss). *See also Cook v. Popplewell*, __ S.W.3d __, No. 2008-CA-001249, 2009 WL 1349145 (Ky. App. May 15, 2009) (analyzing cases from all circuits and states, concluding no right to candidacy under either First or Fourteenth Amendment).

Thus, the plaintiff cannot meet the first element of a retaliation claim because candidacy itself is not a right protected by the First Amendment absent some showing that the adverse action was motivated by the employee's political beliefs, expressions, affiliations, or expression of opinion. Therefore, since Summe cannot establish the first element of a retaliation claim, the court will grant summary judgment to the County on the retaliation claim.[9]

**D.  The court declines to exercise pendent jurisdiction over state claims**.

Summe's remaining claims against Eldridge and Kenton County are state causes of

---

[9]It is doubtful Summe could prove the other elements either, because it is probable that the motive in releasing the report was not to retaliate against her for running for office, but in an effort to defeat her candidacy.

action.  Based upon the court's findings on Summe's federal claims, it declines to exercise

pendent jurisdiction on the state claims.  Therefore, these claims will be dismissed without

prejudice.

Therefore the court, having heard counsel and being advised,

**IT IS ORDERED** as follows:

1.  That defendant Eldridge's motion for summary judgment against Summe  (Doc. 26)

be, and it hereby is, **granted** as to the § 1983 claim;

2. That the motion of Kenton County for Summary Judgment (Doc. 54) be, and it hereby

is, **granted** as to plaintiff's § 1983 claims;

3.  That Summe's state law claims against Eldridge and Kenton County be, and they

hereby are, **dismissed without prejudice**; and

4.  That a separate judgment shall enter concurrently herewith.

This 16th day of June, 2009.



**Signed By:**

**_William O. Bertelsman_**  WOB

**United States District Judge**